**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | |
| ) | Case No. 24-CR-53-GKF |
| ) | |
| SEQUOYAH JO HINZO, ) | |
| ) | |
| **Defendant.** ) | |

## MOTION FOR NONGUIDELINE SENTENCE

Sequoyah Hinzo, by and through undersigned Counsel, moves this Court to impose a non-guideline sentence. Specifically, Mr. Hinzo requests this Court vary downward one level to an offense level of 42, to accept the plea agreement of the parties, and to sentence him to 40 years in prison followed by lifetime supervised release. This request is made in accordance with the plea agreement between Mr. Hinzo and the government, in which the parties jointly request this same sentence. (Dkt. # 32). The requested sentence is sufficient, but not greater than necessary, and is based on consideration of the 18 U.S.C. § 3553(a) factors.

### ARGUMENT AND AUTHORITY

The fundamental rule governing consideration for the district court in sentencing is known as the "parsimony principle"; it is the directive of Congress that the district court shall "impose a sentence sufficient, *but not greater than necessary*, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 U.S. 1170, 1175 (2017)(emphasis added). Further, the Court has emphasized the need for individualized sentencing, reiterating the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 U.S. 1229, 1240 (2011), quoting *Williams v. New York*, 337 U.S. 241, 247 (1949); see also *Miller v. Alabama*, 567 U.S. 460, 469

(2012)("punishment for crime should be graduated and proportioned to both the offender and the offense")(quoting *Weems v. United States*, 30 U.S. 544 (1910)).

In *United States v. Booker*, 125 S. Ct. 738, 756 (2005), the Supreme Court of the United States held that 18 U.S.C. § 3553(b) violates the Sixth Amendment to the extent it makes the Federal Sentencing Guidelines mandatory. The Sentencing Reform Act, as revised by *Booker*, permits a sentencing court to tailor a sentence considering statutory concerns. See 18 U.S.C. § 3553(a), *Booker*, 125 S. Ct. at 757. Under *Booker*, sentencing courts must treat the guidelines as just one of several sentencing factors set forth in 18 U.S.C. § 3553(a), and "may not presume that the guideline range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States*, 522 U.S. 38, 39 (2007).

The intent of 18 U.S.C. § 3553, et seq. is for the sentencing court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth therein. Section 3553(a)(2) states that such purposes are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the kinds of sentences available;
>
> (3)  the need to avoid unwarranted sentence disparities among defendants with

     similar records who have been found guilty of similar conduct; and

 (4) the need to provide restitution to any victims of the offense.

*Booker* requires judicial fact-finding that considers all the § 3353(a) factors, many of which the guidelines either reject or ignore. *United States v. Ranum*, 353 F.Supp.2d 984, 985-86 (E.D. Wisc. 2005). After *Booker*, a sentencing court must consider all the § 3553(a) factors, not just the Guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.

The intent of Congress is for the sentencing court to impose a sentence sufficient, but not greater than necessary. See 18 U.S.C. § 3553 *et seq*. After consideration of these factors and applicable law, the jointly recommended sentence of 40 years followed by lifetime supervised release meets the sentencing goals of 18 U.S.C. § 3553(a).

**1. Sequoyah Hinzo's history and characteristics.**

"He tries his best in everything he does. He really just wants to be normal. He seems to be very sincere." – Rev. Jeffrey A. Higgins, Campus Pastor at Adult & Teen Challenge (June 13, 2023).

Sequoyah grew up in (Little) Kansas, Oklahoma, a town of 754 people in Delaware County, Oklahoma, on the eastern border of the state with Arkansas. Delaware County, Oklahoma, is very poor: with a per capita income of $35,376 and 21 per cent of the population living in poverty.[1] Sequoyah attended Kansas Public Schools where he had an IEP and was in special education classes in every grade. Despite graduating high school, Sequoyah's ability to read and write is

---

[1] QuickFacts Delaware County, Oklahoma, United States Census Bureau (U.S. Census Bureau QuickFacts: Delaware County, Oklahoma)

substantially impaired. Sequoyah feels that he was just passed along through school in order to graduate.

When Sequoyah was four years old, his father, Seffie Hinzo, walked out on his mother, Patricia Lackey, and his siblings. When his parents were together, Seffie was violent—often physically abusive to Patricia. During their marriage, Seffie was violent, often physically abusive to Patricia. One particular memory that stood out for Patricia was when she was pregnant with Sequoyah, she was trying to sit down in a chair, and Seffie pulled the chair out from under her, causing her to crash to the ground. While Seffie was not physically violent to the children, one noted instance of abuse was that he would lock the children outside of the house during the winter, where they were exposed to freezing temperatures for hours.

Seffie walked out on his family in 1998. One day, while Sequoyah was in school at Grove Head Start, Seffie showed up and took Sequoyah out of school before Patricia could pick him up that day. Seffie kept Sequoyah away from Patricia, sometimes for months on end. During the times Sequoyah was with Seffie, Sequoyah never went to school. Patricia feels that Seffie did this to try and manipulate her.

When Seffie had his children, he would send Sequoyah and his brother Deacon out to pick up his drugs. Sequoyah was around seven years old when Seffie first started sending him out to pick up his marijuana and methamphetamine. His dad would give him cash and send him out on foot to pick up his drugs. Sometimes his brother went with him and sometimes Sequoyah was forced to go alone. This happened every single time he visited his father. At this point in his life, Sequoyah tried marijuana for the first time, at only six years old, although he would not start using it daily until age 12. The first time he tried marijuana was with his father. At 14 he was abusing prescription drugs, including daily use of Xanax and Hydrocodone. He was 16 when he first used

methamphetamine, offered to him by a friend's uncle, and by 17 was using methamphetamine daily. According to Sequoyah, he did not have any period of sobriety from age 17 until 2023, when he got to Adult & Teen Challenge. Sequoyah attempted in patient drug treatment in 2023, but was arrested for this offense and taken out of the program.

According to one study published in the American Journal of Psychiatry, there is a link between individuals who experience child abuse and altered development of impulse control disorders and suicide attempts in people suffering from depression.[2] This connection can also be seen when studying Adverse Childhood Experiences, or ACEs. ACEs are potentially traumatic events that occur in childhood and adolescence, such as experiencing physical, emotional, or sexual abuse; witnessing violence in the home; having a family member attempt or die by suicide; and growing up in a household with substance use, mental health problems, or instability due to parental separation, divorce, or incarceration.[3] Exposure to ACEs has been shown to alter the molecular and genetic makeup of a child as well as changing the way the neurological, immune, and endocrine systems develop and function.[4] Experiencing child abuse and other ACEs is linked

---

[2] *The Relationship of Child Abuse to Impulsivity and Suicidal Behavior in Adults with Major Depression*, Am. J. Psychiatry, Beth Brodsky, Ph.D., Maria A. Oquendo, M.D., Ph.D., Steven P. Ellis, Ph.D., Gretchen L. Hass, Ph.D., Kevin M. Malone, M.D., J. John Mann, M.D. (November 2001)

[3] *Identifying and Preventing Adverse Childhood Experiences*, Journal of the American Medical Association, Christopher M. Jones, Pharm.D., Dr.PH., MPH., Melissa T. Merrick, Ph.D., Debra E. Houry, M.D., MPH (November 5, 2019)

[4] *Adverse Childhood Experiences*, Paediatrics and Child Health, Mary Boullier, Mitch Blair, Volume 28, Issue 3 (March 1, 2018)

to impulse control disorders and later substance use disorder.[5,6] Impulse disorders are commonly co-occurring with gambling disorders.[7]

When examining the impact of ACEs on a child, it is more important to examine the accumulation of multiple adversities throughout childhood rather than identifying exposure to any one specific event classified as an ACE.[8] One mechanism responsible for these effects—toxic levels of stress—can be substantially buffered by a stable and supportive relationship with a caregiver. Nationally, 45% of children report having experienced at least one ACE, and those having experienced three or more face an elevated risk of psychological and medical problems.[9] Oklahoma ranks first in the United States in the number of people with an ACE score of at least two,[10] and individuals who had experienced four or more ACEs were 15 times more likely to have perpetrated violence in the last year and 20 times more likely to be incarcerated at some point in their lifetime.[11] Sequoyah's early drug exposure, exposure to domestic violence, and his experiences with his father, are all adverse childhood experiences, which in part can contribute to a myriad of psychological problems.

---

[5] *Profiles of Adverse Childhood Experiences and Impulsivity*, Child Abuse Negl, November 2018, Sunny H. Shin, Shelby Elaine McDonald, David Conley (August 2018)

[6] *Impulsivity as a Mechanism Linking Child Abuse and Neglect with Substance use in Adolescence and Adulthood*, Journal of Development and Psychopathology, Cambridge University Press, Volume 30 Issue 2, Assaf Oshri, Ph.D., Steve M. Kogan, Ph.D., Josephine A. Kwon, M.S., K.A.S., Wikrama, Ph.D., Lauren Vanderbroek, Ph.D., Abraham A. Palmer, Ph.D., and James MacKillop, Ph.D. (June 13, 2017)

[7] *Gambling Disorder*, Cleveland Clinic, Gambling Disorder (Gambling Addiction): What It Is & Symptoms (clevelandclinic.org)

[8] *The Prevalence of Adverse Childhood Experiences, Nationally, by State, and by Race or Ethnicity*, Child Trends, Vanessa Stacks, MPP, David Murphey, Ph.D. (February 12, 2018)

[9] Keaton Ross, *Seeking to Reduce, Treat Effects of Childhood Trauma*, OKLAHOMA WATCH, (August 26, 2021) https://oklahomawatch.org/2021/08/25/seeking-to-reduce-treat-effects-of-childhood-trauma/

[10] OKLAHOMA WATCH, Ross

[11] *Measuring ACEs in an Offender Population*, National Health Service Health Research Authority, Katharine Ford, Ph.D. (August 22, 2017)

Sequoyah was in middle school when his father began getting sick, and he did not understand his father's diagnosis at the time. At one point, Seffie was hospitalized for several months, and Sequoyah would often spend the night at the hospital with his father. On one of these nights, Seffie and Sequoyah were taking a walk around the floor of the hospital when Seffie collapsed. Sequoyah was forced out of the room as staff came flooding in to tend to his father. Sequoyah remembers being scared in that moment—crying and alone. Although he attended his father's funeral, he has no memory of being there. Sequoyah believes that he suffers from anxiety and depression stemming from his father's death, but he has never been treated for either.

As a child, Sequoyah was frequently bullied by his older brother Deacon. His mother describes him as "the baby" of the family and said that he never got in trouble at home or school, and that he was very quiet.

Sexual abuse is a pervasive problem in Sequoyah's family. In interviewing members of Sequoyah's family and reviewing the discovery in this case, there are confirmed accounts and allegations of sexual abuse between numerous family members. Sequoyah's mother was sexually abused by her father. Sequoyah's mother tried her best to keep her father from ever seeing her children, but Sequoyah met his maternal grandfather on two separate occasions. When Sequoyah asked why his mother kept him away from his grandfather, she disclosed to him the abuse she suffered for years at the hands of her father. Adrienne Sanders told law enforcement that Seffie sexually abused Justine (Sequoyah's sister), although Justine and Patricia deny this happened. Adrienne also told law enforcement that Sequoyah's brother Deacon sexually abused a young girl in Delaware county. Additionally, Adrienne's brother Jacob was accused of sexually abusing his girlfriend's daughter. Among this extended family between Kansas and Jay, Oklahoma, sexual abuse is endemic.

2. **The nature and circumstances of the offense.**

The nature and circumstances of the offense are spelled out in the Presentence Investigation Report. Sequoyah's conduct was horrible. 40 years in prison is an incredibly steep sentence for any crime, and he has stipulated with the government that it is an appropriate sentence in this case.

However, the Court should account that Sequoyah's acceptance of responsibility in this case spares three minor victims, as well as other family members, from taking the stand and testifying about what happened to them in a room full of strangers. One of the minor victims in particular had significant issues that would have arisen on cross-examination on trial, but Sequoyah's guilty plea spares these children from the shame and humiliation they could endure as part of the trial process.

In scenarios such as Sequoyah's, where a defendant has a total offense level—after acceptance of responsibility—of 43, there is no practical effect in the guidelines for accepting responsibility. Some defendants, and quite frankly some lawyers, might ask "why *not* go to trial?" because, in theory, what is there to lose? If Sequoyah pleas guilty or goes to trial and is convicted, his guideline at sentencing is the exact same. However, the practical effect—that the minor victims are spared from sentencing—should be accounted for. If the Court does not vary downward, and sentence Mr. Hinzo to forty years in prison, then there was no benefit to him for giving up his trial rights and pleading guilty.

Mr. Hinzo never made representations to the government that he would take this case to trial, in part to ensure that the minor victims would not need to participate in trial preparation. The continuances filed by Mr. Hinzo reflect that the stated purpose for the request was to attempt to negotiate a settlement with the government.

**3. The need to avoid unwarranted sentencing disparities.**

During the five fiscal years from 2019 to 2023, there were 52 defendants whose primary guideline was U.S.S.G. § 2A3.1, with a final offense level of 43 and a Criminal History Category of I, after excluding defendants who received a U.S.S.G. § 5K1.1 substantial assistance departure. For the 52 defendants who received a sentence of imprisonment (100%), the average length of imprisonment imposed was 381 months and the median length of imprisonment was 442 months. 64 per cent of defendants received a downward departure or variance.

Sequoyah Hinzo's request for a one level downward variance and a sentence of 40 years (480 months) does not represent a sentencing disparity for similarly situated offenders. While his conduct would have resulted in a guideline higher than 43 if allowed by law, his requested sentence is nearly 100 months greater than the average sentence length imposed on similarly situated offenders.

**4. The need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

40 years represents the vast majority of the rest of Sequoyah's life. If he survives to walk outside of a federal prison one day, he will in all certainty have lost any family and friends he has now. While the sentencing guidelines suggest a life sentence is appropriate, a sentence of 40 years in prison, which will put Sequoyah near the age of 70 when he is expected to discharge his sentence, satisfies this goals listed in this portion of 18 U.S.C. § 3553.

**5. The need to protect the public from further crimes of the defendant.**

In 2010, the United States Sentencing Commission conducted a comprehensive analysis of all federal offenders who were released from federal prison in 2010 as part of the Commission's ongoing recidivism studies. The study group comprised 32,135 offenders who satisfied certain criteria (United States citizens, re-entered the community in 2010 after discharging a sentence of

9

incarceration or being placed on probation, not reported dead, escaped, or detained, and have valid FBI numbers which could be located in criminal history repositories). Of that study group, there were 4,091 "older offenders," that is, offenders who were at least 50 years of age at sentencing.

One key takeaway is that the recidivism rate of "older offenders" (21.3%) was less than half that of offenders under the age of 50 (53.4%). Older offenders also had a small median number of recidivism events (one), compared to offenders under the age of 50 (three).

Table 5. Recidivism Rates by Age Category
Release Cohort 2010

|  | Offenders Under 50 (n=28,044) | Older Offenders (n=4,091) |
|---|---|---|
| Percent Rearrested | 53.4% | 21.3% |
| Median Time to Recidivism Event | 19 Months | 20 Months |
| Median Number of Recidivism Events | 3 | 1 |
| Most Common Post-Release Event | Assault (21.2%) | Probation/Parole/Supervised Release Violation (16.0%) |

Older offenders in the 2010 release study also recidivated for less serious crimes than offenders under the age of 50. The most common recidivism events for older offenders were supervision violations (16.0%) and administration of justice offenses (12.3%). Older offenders had a lower rate of violent recidivism (19.2%) compared to offenders under the age of 50 (32.1%). Assault was the most common violent offense for both groups of offenders, but older offenders were rearrested for assault (12.2%) nearly half as often as offenders under the age of 50 (21.2%).

10



Under the current state of the law, the earliest Mr. Hinzo could potentially be released would be at age 63, after serving 85 percent of a 40 year sentence, although if he serves the full term of his sentence, he will be 70 when he is released. Whether he is released after serving 85 percent of his sentence, his entire sentence, or somewhere in between, Mr. Hinzo will fall into the category of older offenders (under the criteria of the recidivism study). His age at release puts him in a cohort of federal offenders that is far less likely to reoffend than someone younger than him.

Beyond the time that he spends in prison, the stipulated sentence recommended by the parties includes lifetime supervision. The sentence in the plea agreement is sufficient to accomplish the goals of this subsection of 18 U.S.C. § 3553.

6. **The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Prior to his arrest, Mr. Hinzo had started treatment for his drug addiction at Adult & Teen Challenge, but was arrested at the program and was unable to complete his treatment. Mr. Hinzo has expressed interest in participating in drug treatment while in BOP, although he will not be able to participate in RDAP because of his offenses. He will still be able to participate in NRDAP and other non-residential drug treatment programs. 40 years in prison will be sufficient time for Mr. Hinzo to complete all the programs that the Bureau of Prisons has to offer.

## CONCLUSION

Mr. Hinzo's conduct falls into the category of the most serious conduct prosecuted by the federal government. There is no sentence that will adequately serve justice to the victims in this case. However, a life sentence as compared to a 40 year sentence will not help the victims recover in any way. Based on the above consideration of the statutory sentencing factors, 40 years is a sufficient sentence for Mr. Hinzo's conduct.

Based on the above argument and authority, Mr. Hinzo respectfully requests this Court to vary downward one level, accept the plea agreement between he and the government, and follow the parties' joint recommendation to sentence him to 40 years in prison and lifetime supervised release.

Respectfully submitted,

**OFFICE OF THE FEDERAL PUBLIC DEFENDER**

Julia L. O'Connell, Federal Public Defender

By: s/ Thomas S. Reese
Thomas S. Reese, OBA # 33042
Assistant Federal Public Defender
Federal Public Defender's Office
Williams Tower I, Suite 1225
One West Third Street
Tulsa, Oklahoma 74103-3532
Telephone: (918) 581-7656
E-mail: thomas_reese@fd.org

*Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I certify that on February 10, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s):

George Jiang
Assistant United States Attorney
Office of the United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119

*Counsel for the Plaintiff*

s/Thomas S. Reese
Thomas S. Reese